UNITED STATES

v.

**Sergeant Michael E. VAN HOOSE, FR 554–84–2576 United States Air Force.**

**ACM 22887.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 24 May 1980.

Decided 21 July 1981.

Appellate Counsel for the Accused: Colonel Larry G. Stephens, Colonel George R. Stevens and Major Wade B. Morrison.

Appellate Counsel for the United States: Colonel James P. Porter and Captain Richard O. Ely, II.

Before POWELL, KASTL and MAHONEY, Appellate Military Judges.

## DECISION

POWELL, Senior Judge:

We decide that sexually oriented magazines, devices and information written on a piece of paper, found during an authorized and lawful search for marijuana and related paraphernalia, were not legally seizable under the "plain view" doctrine. There was no probable cause to believe at the time of seizure that the items seized were evidence of any crime. Therefore, the materials, as well as testimony of two witnesses derived from the information seized, were inadmissible in evidence at the accused's court-martial. We dismiss four specifications, affirm eight specifications and reassess the sentence.

Contrary to his pleas, the accused was convicted by general court-martial, consisting of members, of six specifications of sodomy and six specifications of taking indecent liberties with males under 16 years of age, violations of Articles 125 and 134, Uniform Code of Military Justice, 10 U.S.C. §§ 925, 934.[1] The approved sentence is a dishonorable discharge, confinement at hard labor for ten years, forfeiture of all pay and allowances and reduction to airman basic.

The sodomy offenses were committed on three 14 year old males; the indecent liberties were performed contemporaneously with the respective sodomy offenses. One person, M, was the victim in eight of the offenses. R and C were separate victims of the four remaining offenses. The testimony of the victims convincingly proved that on the various occasions alleged, while in the accused's barracks room on Shaw Air Force Base, South Carolina, the accused performed fellatio on the victims and engaged in foreplay including kissing, undressing the body and stroking the penis of each of the three individuals. Additionally, on one occasion, the accused placed his penis against M's rectal area. This evidence proved the accused's guilt as to each of the offenses beyond a reasonable doubt.

Among other assigned errors, appellate defense counsel claim that the military judge erred by admitting into evidence various sexually oriented materials,[2] and the testimony of victims R and C because this evidence was obtained as a result of an unlawful search and seizure. We address only the issue of the lawfulness of the search and seizure. We have considered the remaining assigned errors and resolved them adversely to the accused.

On 4 October 1979, Senior Airman Schmidt, a security police dog handler, assisted by Airman First Class Thompson, and accompanied by a working marijuana and

---

1. The accused was acquitted of one specification alleging an offense of kidnapping for the purpose of gratifying his sexual desires, a violation of 18 U.S.C. § 1201 and Article 134, Uniform Code of Military Justice.

2. Prosecution Exhibit 1 is a leather "slave collar" found in a nightstand drawer. Prosecution Exhibits 2, 3 and 4 are, respectively, a metal chain and two penis "sleeves" or "harnesses" which were found in dresser drawers. Prosecution Exhibit 5 was removed from a wall and is a poster depicting a male's rear with his pants lowered so as to expose his buttocks. Prosecution Exhibit 6 is a printed order form listing sexually oriented films which appears to have been removed from a magazine. Prosecution Exhibits 7 through 14 are magazines entitled: *Do Your J/O?*, *Cruise Catalog*, *Playgirl Presents Men of the World*, *Gay is Beautiful*, *Cum*, *Naughty Nurses*, and *Blueboy*. The magazines were found at differing locations in the room. Some were on a desk and in a file on the desk. Others were removed from two clothes lockers, access to which was gained by cutting off the lock of one and unscrewing the hasp and lock from the other.

heroin detection dog named "Missy," conducted a "walk through" of the hallways and common areas of Barracks 401 on Shaw Air Force Base. Schmidt was required to conduct these inspections in each barracks at least once a month and 401 was due. When passing room 314, "Missy" reacted by demonstrating her customary alert indicating the presence of controlled substances. Schmidt knocked at the door of the room shared by Senior Airman Maloney and the accused, but received no response. Posting Thompson at the door, Schmidt telephoned the security police desk sergeant to inform appropriate authorities of the alert. The desk sergeant contacted the base commander, Colonel Watkins, informed him of "Missy's" alert and requested authority to search the room. Colonel Watkins, being familiar with "Missy's" experience and satisfied as to the dog's reliability at detecting controlled substances, authorized the search for marijuana and related paraphernalia. The dormitory unit's first sergeant, Master Sergeant Hill, arrived and unlocked the door to the accused's room. Later, Sergeant Halpin, also a security policeman, assisted in the search.

Once inside the room, "Missy" alerted on various items, including a desk drawer, nightstand, clothes locker and refrigerator. Schmidt opened the refrigerator and saw a bottled substance he suspected to be amyl nitrate. This was shown to Halpin who, not knowing whether it was a controlled substance, notified the Office of Special Investigations (OSI). Special Agent Billmaier was contacted and requested to come to the barracks room to assist in the search. Prior to Billmaier's arrival, the security policemen, in looking through papers and materials located throughout the room, had found various sexually oriented magazines, other printed matter and leather devices. After perusing and discussing these items, they decided to place all such material on a bed for Billmaier's advice as to whether to seize any of the items. Other items were added

to this collection as they were discovered during the search which continued after Billmaier arrived. He advised that the amyl nitrate was not a controlled substance and not seizable.

While assisting in the search, Billmaier looked through miscellaneous papers which were on top of a desk. As he unfolded a paper napkin, he found written the name R, "16 years," a local telephone number and the phrase "bisexually beautiful." Billmaier copied this information into his notebook. When the search was completed, Billmaier, who had examined the material on the bed and concluded that it was "homosexually oriented pornography and sexually deviant material," instructed the security policeman to take all the items into custody. The items were placed in a large plastic bag and removed to security police headquarters.[3]

The next day, after informing the base commander of the results of the search, the OSI opened an investigation on the accused for possession of the material found. The information noted from the napkin was not mentioned in the initial report to the commander. Its use was triggered later when M, whose allegations came to the authorities independent of this search and seizure, disclosed to the OSI the accused's involvement in sodomy offenses. Thereafter, using the notes from the napkin, Billmaier interviewed R, who told the OSI about similar acts with the accused and further suggested C as an additional lead. C was contacted and the information verified.

██ Initially, we are satisfied that the search itself was reasonable. We find that Schmidt, Thompson and "Missy" were legitimately present in the third floor hallway of Barracks 401 and that "Missy's" alert on the door to room 314, when communicated to Colonel Watkins, who was familiar with "Missy's" qualifications, provided sufficient probable cause to support the authorization to search.[4] The security policemen with the

---

3. During the search the only controlled substance found was a trace of marijuana which was in a jacket pocket in the clothes locker used by Maloney, the accused's roommate.

The substance was consumed in the test to determine its identity.

4. *United States v. Grosskreutz,* 5 M.J. 344 (C.M.A.1978); *United States v. Paulson,* 2 M.J.

assistance of the OSI agent properly executed the search by thoroughly looking into areas where marijuana, controlled substances or evidence thereof could conceivably be found. The crucial and narrow issue governing our disposition of this case is whether the seizure of the materials and the information from the napkin[5] was legal, thus making the evidence and the fruits thereof admissible in the accused's court-martial. We hold that it was not.

In *United States v. Burnside*, 15 U.S.C. M.A. 326, 35 C.M.R. 298 (1965), the Court of Military Appeals recognized that both a search and seizure must meet the Fourth Amendment requirement of reasonableness; *see, United States v. Thomas*, 16 U.S.C.M.A. 306, 36 C.M.R. 462 (1966); and that a search can be legal but a seizure of property or papers found during the search may be illegal; *see, United States v. Hendrix*, 21 U.S.C.M.A. 412, 45 C.M.R. 186 (1972). The determination of what may be properly seized usually involves fitting any items found within the general or specific description of items sought, or offenses under investigation, as reflected in the authorization to search.

Even if not encompassed within such warrants or authorizations, seizures may also be upheld under the "plain view" doctrine. This basis as stated in *Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968), is: "[O]bjects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." The "plain view" doctrine was further examined and limited in *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971), as follows:

[T]he extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the "plain view" doctrine may not be used to extend

a general exploratory search from one object to another until something incriminating at last emerges.

See Justice Stewart's concurring opinion in *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 1250, 22 L.Ed.2d 542 (1969).

The application of the doctrine is illustrated well in the case of *United States v. Clark*, 531 F.2d 928, 932 (8th Cir. 1976), where the Court in upholding the suppression of a semiautomatic pistol seized while executing a search warrant for controlled substances, stated:

[I]n order to qualify for the plain view exception, it must be shown (1) that the initial intrusion which afforded the authorities the plain view was lawful; (2) that the discovery of the evidence was inadvertent; and (3) that the incriminating nature of the evidence was immediately apparent . . . .

The first requirement, a lawful initial intrusion, was clearly met in the instant case since the investigating officers were acting pursuant to a legitimate search warrant allowing a search for any controlled substances located on Clark's premises. The second requirement, an inadvertent discovery, also appears to have been satisfied. The record does not indicate that the officers had known prior to the search the existence and location of the pistol eventually found in Clark's bedroom.

The third requirement, however, was not met in the instant case. There is no adequate foundation in the record to support the conclusion that the incriminating nature of the pistol was "immediately apparent." The record fails to reveal a sufficient factual basis which would have given the officers reasonable cause to believe the pistol was contraband . . . . There was no nexus between the pistol and the crime of unauthorized distribu-

326 (A.F.C.M.R.1976), modified on other grounds, 7 M.J. 43 (C.M.A.1979).

5. We find that obtaining the information by unfolding the napkin was a seizure. The accused had a reasonable expectation of privacy

in relation to this writing. His expectation was violated by recording the information. *United States v. Gray*, 484 F.2d 352 (6th Cir. 1973); *United States v. Sokolow*, 450 F.2d 324 (5th Cir. 1971).

tion of a controlled substance. Similarly, the record does not indicate that the officers at the time of the initial search were motivated by any specific, reasonable cause to believe the pistol was evidence of any crime. . . .

Under these circumstances, we regard the actions of the police officer, which resulted in a wholesale examination of appellee's property unrelated to the authorized search for controlled substances, as inconsistent with the thrust of the plain view doctrine. [Citations and footnote omitted.]

▪ Applying this criteria to the instant case, we find, as previously indicated, that the law enforcement officials were legitimately present in the room and conducting a lawful search. We agree with the military judge's finding that the discovery of the evidence was inadvertent. However, we are unable to find that the incriminating nature of the evidence was immediately apparent. The material found was not contraband nor was its mere possession illegal. *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

▪ There was no connection between the suspected possession of marijuana and the sexually oriented materials. Lastly, the facts and circumstances do not establish reasonable cause to believe at the time of the seizure that any of the items were evidence of any crime.[6] At best, the information viewed by unfolding the napkin created a suspicion that the writer may have been indicating a sexual preference. Whether he did or intended to do anything in furtherance of that preference with the individual described was pure speculation. Suspicion and speculation do not constitute

reasonable cause to believe that this information is evidence of a crime. *State v. Hoggans*, 35 Or.App. 669, 582 P.2d 466 (1978). We conclude therefore that the evidence was unlawfully seized. Because the identity of victims R and C was obtained through the exploitation of this illegally seized evidence, their testimony likewise was inadmissible. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *United States v. Peurifoy*, 22 U.S.C.M.A. 549, 48 C.M.R. 34 (1973); *United States v. Armstrong*, 22 U.S.C.M.A. 438, 47 C.M.R. 479 (1973).

▪ The exclusion of the testimony of R and C requires us to set aside the findings of guilty of Specifications 5 and 6 of both Charges I and II.[7] These four specifications are dismissed. With regard to the findings of guilty of Specifications 1 through 4 of both Charges I and II, we are convinced beyond a reasonable doubt that the erroneous admission of the evidence was harmless. We find that the error did not contribute to the convictions for these eight offenses. *United States v. Ward*, 1 M.J. 176 (C.M.A.1975). M's convincing testimony furnished proof of these offenses beyond a reasonable doubt. His testimony was not self-contradictory, uncertain or improbable. The defense's presentation at trial was limited to the accused's general denial of kidnapping M without his consent, of which the accused was acquitted. Specifically, regarding the evidence, the court members were simply told that M observed the same or similar magazines and devices when in the accused's room. There was no testimony that any of the items were used on M or that the accused used the reading material in furthering his sexual advances

---

6. Although not a controlling factor in our decision, we note that the record reflects that not one of the participants in this search regarded the items as evidence of criminal activity. We have considered the conclusion of the OSI agent that the seizure was justified because homosexuality is a basis for administrative separation from the Air Force. We also appreciate that the knowing possession of material like that found, warrants a suspicion that the possessor thus demonstrates that sexual preference or tendency. However, under the facts

of this case, in determining the admissibility of evidence in a court-martial, we decline the invitation to extend the "plain view" doctrine beyond criminal activity.

7. There is no evidence that this testimony was obtained from an independent source or so attenuated as to dissipate the illegal taint. *See generally, United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *United States v. Kesteloot*, 8 M.J. 209 (C.M.A.1980).

on M. Lastly, the factfinders were not told where or when the prosecution exhibits were obtained as no evidence of the facts and circumstances of the search and seizure was presented to the court members.

█ For the reasons stated, the findings of guilty of Specifications 5 and 6 of Charge I and Specifications 5 and 6 of Charge II are set aside and the specifications are dismissed. We have reassessed the sentence based on the remaining findings of guilty and in the light of the error we discuss. We find only so much of the sentence as provides for dishonorable discharge, confinement at hard labor for four years, for-feiture of all pay and allowances and reduction to airman basic to be appropriate.

The findings of guilty of Specifications 1 through 4 of Charge I, Charge I, Specifications 1 through 4 of Charge II and Charge II, and the sentence, as modified herein, are

AFFIRMED.

KASTL and MAHONEY, Judges, concur.